# Supreme Court of Texas

No. 20-0687

Kenneth L. Berry, Individually; Kenneth L. Berry, as Trustee of
the Berry Dynasty Trust; Kenneth L. Berry, Trustee in a
Derivative Capacity for Flying Bull Ranch, Ltd.;
and Chelsea Nicole Briers,

*Petitioners*,

v.

Dennis W. Berry; Marvin G. Berry; Allen L. Berry; FB Ranch,
LLC; Berry GP, Inc. d/b/a/ Berry Contracting, Inc.; Berry
Contracting, LP d/b/a Bay, Ltd.; and Berry Ranches, LLC,

*Respondents*

On Petition for Review from the
Court of Appeals for the Thirteenth District of Texas

**Argued February 24, 2022**

Justice Blacklock delivered the opinion of the Court.

Justice Huddle and Justice Young did not participate in the
decision.

This is a long-running dispute over the use of a family ranch.  The
district court rejected all the plaintiffs' claims on summary judgment.
The court of appeals reversed in part, allowing many of the claims to

proceed. We conclude that all claims brought by Kenneth Berry were properly rejected by the district court but that Chelsea Berry's claims should have been allowed to proceed. The court of appeals' judgment is affirmed in part and reversed in part, and the case is remanded to the district court for further proceedings.

## I.

## A.

Kenneth Berry and his daughter, Chelsea Briers, sued Kenneth's three brothers and several companies controlled by his brothers and their mother. The two sides have quarreled for many years over a family ranch, which Kenneth's parents bought over sixty years ago in the hope that their descendants would enjoy the ranch as a family legacy. The sad history of this family feud follows.

Around 1960, Marvin and Laura Berry purchased a ranch in Real County. They named it Flying Bull Ranch. In 1997, Mr. and Mrs. Berry created Flying Bull Ranch, Ltd. (the Partnership), a Texas limited partnership. They transferred ownership of the Ranch to the Partnership, in which Mr. and Mrs. Berry both owned a 49% interest as limited partners. The remaining 2% was owned by the general partner, FB Ranch, LLC (FB Ranch). Mr. and Mrs. Berry were both managers of FB Ranch. The Berrys had four sons: Kenneth, Dennis, Marvin G., and Allen.

Shortly before Mr. Berry passed away in 1997, the Berrys donated their 98% limited-partner interest in the Partnership to the Berry Dynasty Trust (Trust). The Trust became the sole limited partner.

After Mr. Berry's death, Laura Berry became the sole owner and manager of FB Ranch.

Written agreements govern the Partnership and the Trust. Section 1.3 of the Partnership Agreement states that the purpose of the Partnership is "to own and manage" the Ranch "and to engage in farming, ranching and wildlife . . . management and in connection with such business to own, develop, and manage the assets of the partnership." Sections 5.1 and 5.4 grant broad powers to FB Ranch, the general partner, to manage the affairs of the Partnership, but the general partner is not permitted to lease the Ranch for a term longer than three years. The Partnership Agreement further provides that the Berrys will not sell the Ranch except to each other, to a trust benefitting the family, or to another entity controlled by the Berrys or their trust. The parties agree that the Berrys considered the Ranch a special place and intended the Ranch to stay in the family.

Section 1.1 of the Trust Agreement states that the Trust is established "for the benefit of our children, Dennis W. Berry, Kenneth L. Berry, Marvin G. Berry, and Allen L. Berry, and their issue. Such children and issue are sometimes referred to hereinafter as the 'demand beneficiaries' of the trust." When the Trust was created, Kenneth's daughter Chelsea was alive, and the parties agree she is a demand beneficiary. The Trust Agreement also evidences the Berrys' desire to keep the Ranch in the family. Section 5.4 states that "[t]he trustees shall be expressly prohibited from consenting to the dissolution of [the Partnership] and from consenting to the sale of the ranch land owned by [the Partnership]."

Mr. Berry started a successful business, which remains in operation and has undergone several changes in corporate structure over the years. Its current form is Berry GP, Inc. d/b/a Berry Contracting, Inc. (Berry Contracting). Two other companies are involved in this case. Berry Contracting, LP, d/b/a Bay, Ltd. (Bay Limited), is a subsidiary of Berry Contracting. Berry Ranches, LLC, (Berry Ranches) is a company owned by Laura Berry.

At the time Mr. Berry died in 1997, his son Kenneth was president of Berry Contracting. After a falling out with his family, Kenneth resigned in 1998. According to the family, the falling out was over Kenneth's attempt to secretly sell off parts of Berry Contracting while his father was dying. In 2000, Kenneth sold his interests in the family's companies to his brothers. Litigation followed. We count at least seventeen lawsuits among Kenneth and his family, including the present suit. In 2005, the family agreed to a global settlement agreement, which contained a mutual release between Kenneth and his family, including their companies. Litigation, however, did not end.

This particular lawsuit arises from the following facts. Berry Contracting used the Ranch for business purposes over the years. It did so pursuant to oral and written lease agreements, and it paid rent to the Partnership, which owns the Ranch. For many years, Berry Contracting paid $40,000 annually to use the Ranch under an oral lease. Charles Vanaman, an attorney for Berry Contracting and other Berry companies, testified that the terms of the lease had not changed since 1989. In addition, since 1996, Berry Ranches paid the Partnership for a grazing and hunting lease on the Ranch.

The parties have very different stories about missing lease payments owed to the Partnership. Vanaman testified that, from 2000 to 2007, Berry Contracting did not make the $40,000 lease payments. Kenneth claimed this was part of a plot by his brothers, who controlled Berry Contracting, to enrich themselves. Kenneth also claimed that Berry Contracting improperly paid Berry Ranches over $600,000 to lease the Ranch. Kenneth claimed these payments should have gone to the Partnership because the Partnership, not Berry Ranches, owns the Ranch and is therefore entitled to receive the lease payments. Laura testified that the payments to the wrong company began in 2000 or 2001. Kenneth contends that this misallocation of lease payments was part of a scheme to direct the payments back to his brothers. The effect of this alleged scheme was to allow the brothers to use the Ranch to benefit themselves and Berry Contracting without paying a fair rent to the Partnership. Kenneth alleges that because the Trust holds a 98% interest in the Partnership, the failure to pay rent to the Partnership reduced the funds that flowed to the Trust, which are held for the benefit of Kenneth, his brothers, and their children.

Kenneth's brothers conceded that lease payments from Berry Contracting should not have been deposited in Berry Ranches' account. They claimed the checks were made out to "Flying Bull Ranch" and sent to Laura, their mother, who accidentally deposited the payments in the wrong account. They say the error was due partly to a mistake in an organizational chart describing the family's myriad business entities.

In March 2007, Berry Contracting and the Partnership executed a written lease of the Ranch for the first time. The lease was

5

retroactively dated to 2000, and a Memorandum of Lease describing the lease was recorded in the courthouse records in December 2008. The lease had an initial 25-year term, renewable for up to 99 years. Kenneth complains that the lease was "backdated" and provided inadequate compensation for the use of the Ranch. He also complains that the lease violated the Partnership Agreement's ban on leases exceeding three years and that the long duration of the lease was effectively a sale of the Ranch in violation of Section 5.4 of the Trust Agreement. Kenneth claims he did not discover the 2007 written lease until 2015. He claims his co-trustees never disclosed the existence of the written lease prior to his discovery of it.

**B.**

In 2016, Kenneth and his daughter Chelsea filed this suit. They sued Kenneth's three brothers, as well as FB Ranch, Berry Contracting, Bay Limited, and Berry Ranches. The suit alleges that Berry Contracting did not pay for its use of the Ranch, that payments were wrongfully sent to Berry Ranches, and that the lease's term is impermissibly long. The suit also complains that a $40,000/year lease payment is below market value.

Kenneth alleges claims in three separate capacities: as a beneficiary of the Trust, as a trustee of the Trust, and in a derivative capacity on behalf of the Partnership. Chelsea alleges her claims in her capacity as a Trust beneficiary. The petition asserts breach of fiduciary duty claims seeking damages against the other trustees—brothers Dennis, Marvin G., and Allen. It further alleges that the brothers and the other defendants conspired in, and aided and abetted, the breaches

6

of fiduciary duty. Kenneth, in his capacity as a trustee and in an alleged derivative capacity on behalf of the Partnership, sought to recover damages for both the Trust and the Partnership. Kenneth also sought removal of the other trustees, a Trust accounting, attorney's fees, punitive damages, and a declaratory judgment.

After the suit was filed, the defendants and other family members—but not Kenneth or Chelsea—entered into the "Consent Agreement." This agreement recites that Laura inadvertently deposited lease payments from Berry Contracting into Berry Ranches' account instead of into the Partnership's account. Under the Consent Agreement, Laura transferred $440,000 from Berry Ranches to the Partnership. The family also modified the lease to a three-year term, in acknowledgment of the Partnership Agreement's limitation on lease duration. The Consent Agreement states that the signing parties believe it is not in the Trust's best interests to pursue the claims alleged by Kenneth on the Trust's behalf. The Consent Agreement purported to release all parties from liability. The defendants contend that, after the Consent Agreement, there is little remaining point to the pending suit, because the Partnership and the Trust were made whole and the lease has been amended to conform to the requirements in the family's previous agreements. Kenneth and Chelsea, however, refused to sign the Consent Agreement. They apparently continue to see a reason to pursue litigation, which is why this case persists.

The defendants filed a combined plea to the jurisdiction/motion for summary judgment/motion to dismiss. The motion argued that (1) Chelsea lacks standing as a beneficiary, and (2) Kenneth lacks

standing to assert claims on the Trust's behalf and lacks standing to bring a derivative suit on behalf of the Partnership. The defendants separately sought summary judgment based on the statute of limitations against all claims premised on the written lease executed in 2007. The district court treated both motions as summary-judgment motions. It granted the standing motion as to both plaintiffs and granted the limitations motion as to Kenneth.

After the summary-judgment rulings, the parties argued about the effect of the rulings on the pending claims, but they ultimately stipulated that the "only remaining triable issue" was attorney's fees. The plaintiffs do not argue on appeal that any of their claims were not adequately disposed of by the district court's summary-judgment rulings. The district court awarded both sides an offsetting amount of $85,000 in attorney's fees.

The plaintiffs appealed. Both Kenneth and Chelsea argued that they have standing to bring their claims. Kenneth also argued that his breach of fiduciary duty claims, asserted against the co-trustees, were not barred by the statute of limitations. The court of appeals affirmed the dismissal of Chelsea's claims and affirmed the dismissal of some of Kenneth's claims, but it reversed as to Kenneth on the statute-of-limitations issue. ___ S.W.3d ___, 2020 WL 1060576, at *6–7 (Tex. App.—Corpus Christi–Edinburg Mar. 5, 2020). The court declined to reach the plaintiffs' attorney's fees and discovery issues. *Id.* Both sides petitioned for review in this Court, and we granted both petitions.

## II.

## A.

The defendants seek reinstatement of the district court's decision that the statute of limitations bars Kenneth's claims against his co-trustees for breach of fiduciary duty. We review summary judgments de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). We agree with the district court that these claims are time-barred.

The statute of limitations for breach of fiduciary duty is four years. *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 707 (Tex. 2021); TEX. CIV. PRAC. & REM. CODE § 16.004(a)(5). Generally, a claim accrues when the defendant's wrongful conduct causes the claimant to suffer a legal injury. *Am. Star Energy & Mins. Corp. v. Stowers*, 457 S.W.3d 427, 430 (Tex. 2015). A legal injury occurs—and the statute of limitations begins to run—"when facts come into existence that authorize a party to seek a judicial remedy." *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003). A cause of action accrues when the injury occurs, "even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996).

Kenneth's claims for breach of fiduciary duty allege that (1) lease payments were not made to the Partnership, or were set at a below-market amount, and (2) the 2007 written lease was for a term exceeding the Partnership Agreement's three-year cap. As for the timing of these alleged injuries, Kenneth claims that, as far back as 2000, lease payments due to the Partnership were misdirected to Berry

9

Ranches. He claims that no lease payments were made by Berry Contracting from 2000 to 2007 but that Berry Contracting and the Partnership entered into a written lease in March 2007 that was backdated to 2000. The written lease provided for annual rent of $40,000, an amount allegedly below market value, and contained a lease term far in excess of the three-year limit imposed by the Partnership Agreement. These alleged breaches of fiduciary duty all occurred between 2000 and 2007. Kenneth sued in 2016, well outside the four-year statute of limitations.

Kenneth seeks to avoid the limitations bar by invoking the discovery rule, under which "the statute of limitations does not begin to run until the claimant knew or should have known of facts that in the exercise of reasonable diligence would have led to the discovery of the wrongful act." *Little v. Smith*, 943 S.W.2d 414, 420 (Tex. 1997). Stated a slightly different way, "[t]he discovery rule exception defers accrual of a cause of action until the plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to the cause of action." *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996).

The discovery rule is a narrow exception that is only applied in "exceptional cases." *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 313 (Tex. 2006). Applications of the rule "should be few and narrowly drawn." *S.V.*, 933 S.W.2d at 25. Whether the plaintiff "should have known" of the facts giving rise to the claim is an objective inquiry. The question is whether the injury incurred is "inherently undiscoverable." *Id.* at 7. "An injury is inherently undiscoverable if it is by nature unlikely to be

10

discovered within the prescribed limitations period despite due diligence." *Id.*; *accord Via Net*, 211 S.W.3d at 313; *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734–35 (Tex. 2001).

Also applicable here is the principle of constructive notice of property records. Kenneth does not dispute that the Memorandum of Lease, described above, was properly recorded in December 2008. By statute, "[a]n instrument that is properly recorded in the proper county is . . . notice to all persons of the existence of the instrument." TEX. PROP. CODE § 13.002(1). We have often held that accrual of a claim is not delayed when information that would reveal the existence of the injury is publicly available. For example, "when there is actual or constructive notice, or when information is readily accessible and publicly available, then, as a matter of law, the accrual of a fraud claim is not delayed." *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 59 (Tex. 2015) (citation and internal quotation marks omitted).[1]

In *Archer v. Tregellas*, we recognized that the constructive notice conveyed by deed records does not always bar application of the

---

[1] S*ee also Carl M. Archer Tr. No. Three v. Tregellas*, 566 S.W.3d 281, 291 (Tex. 2019) (recognizing that application of the discovery rule has been rejected in cases where information was publicly available); *Shell Oil Co. v. Ross*, 356 S.W.3d 924, 929–30 (Tex. 2011) (holding that the discovery rule does not apply to claims of underpayment of royalties where publicly available information would have revealed underpayments); *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 67 (Tex. 2011) (stating that parties "did not exercise reasonable diligence" if they could have discovered wrongdoing "by reviewing information available in the public record"); *HECI Expl. Co. v. Neel*, 982 S.W.2d 881, 887 (Tex. 1998) ("Nevertheless, filings and other materials publicly available from the Railroad Commission are a ready source of information, and a cause of action for failure to provide that same information is not inherently undiscoverable.").

discovery rule. We confined the exception, however, to cases where the plaintiff had no "reason to monitor" the deed records because he had "no reason" to "believe" or "suspect" that a legal injury had occurred. 566 S.W.3d 281, 290–92 (Tex. 2019). *Archer* was a suit by holders of a right of first refusal to purchase a mineral estate. The grantors of the ROFR sold the mineral estate to someone else. The holders of the ROFR sued more than four years after the deed was recorded. We held that the recorded deed did not operate as constructive notice so as to prevent application of the discovery rule. We recognized that in general the discovery rule does not apply where publicly available information would reveal the facts giving rise to the plaintiff's claim. *Id.* at 291. However, we also recognized that this general rule must give way when the plaintiff had no reason to believe or suspect that an injury has occurred and therefore no reason to monitor property records. *Id.* at 290–91. Because the ROFR was a "dormant option" under which the holders were entitled to receive notice of any proposed sale, they had "no reason to believe that [their] interest may have been impaired" and therefore no reason to search the records. *Id.* On the other hand, we observed that the discovery rule would not apply where the plaintiff is "given some indication" of an impairment of his rights "and thus has reason to monitor whether that has occurred." *Id.* at 292.

The undisputed facts of this case compel the conclusion that Kenneth had actual notice of facts "that in the exercise of reasonable diligence would have led to the discovery of the wrongful act." *Little*, 943 S.W.2d at 420. Kenneth long knew or should have known that something was amiss with regard to the family's leasing arrangements

12

for the Ranch, giving him plenty of "reason to monitor whether that has occurred." *Archer*, 566 S.W.3d at 292. In light of this knowledge, the exercise of reasonable diligence would have led him to discover the recorded Memorandum of Lease.

As the former president of Berry Contracting, Kenneth was aware that Berry Contracting had leased the Ranch for many years before the lease was reduced to writing. Correspondence between Kenneth and his mother in 2000 and 2006 confirms Kenneth's awareness that Berry Contracting was leasing the Ranch. And on several occasions, beginning in 2006, Kenneth asked Laura and his co-trustee brothers about leases or other agreements regarding use of the Ranch. They did not respond by providing him with the lease, but his inquiries indicate his awareness of the potential problem, and this awareness obligated him to make further inquiry on his own if he wanted to preserve a timely claim.

Kenneth also knew or should have known that, despite the existence of leasing arrangements, no payments or insufficient payments were coming to the Partnership. Kenneth was a trustee of the Trust that owned 98% of the Partnership, which in turn owned the Ranch, the Partnership's only asset. As a trustee, he was legally obligated to familiarize himself with the assets owned by the Trust and to protect those assets. *See Linegar v. DLA Piper LLP (US)*, 495 S.W.3d 276, 281 (Tex. 2016) ("We recognize that, as trustee, Zaychan had duties that included the duties to hold, invest, and protect the Fund's assets."); RESTATEMENT (SECOND) OF TRUSTS § 231 cmt. b (AM. L. INST. 1959) (noting that a "trustee is under a duty to use reasonable care to keep himself informed in regard to the property which he holds in trust").

13

Bank statements and check registers for the Trust, going back to 2001, show no rental payments from Berry Contracting. As a trustee, Kenneth knew or should have known of this discrepancy.

In concluding that the discovery rule delayed accrual of Kenneth's claims despite the recorded Memorandum of Lease, the court of appeals relied primarily on our decision in *Archer*. But unlike *Archer*, this is not a case in which Kenneth had "no reason to believe" that his legal interests had been impaired and, therefore, no "reason to monitor" the courthouse records. *Archer*, 566 S.W.3d at 292. To the contrary, Kenneth had abundant indications that a legal injury may have occurred, which gave him every "reason to monitor" the public records regarding the Ranch as part of a diligent inquiry into the matter. *Id.*

Kenneth relies heavily on his status as a trust beneficiary owed fiduciary duties by his trustee brothers. He contends he should not be charged with notice of a lease that should have been provided to him by his fiduciaries. Kenneth is correct that the discovery rule can be invoked when "a person to whom a fiduciary duty is owed is either unable to inquire into the fiduciary's actions or unaware of the need to do so." *S.V.*, 933 S.W.2d at 8. But those owed a fiduciary duty are not altogether absolved of the usual obligation to use reasonable diligence to discover an injury. *Little*, 943 S.W.2d at 420 (applying reasonable diligence requirement to breach of fiduciary duty claim). Although the presence of a fiduciary relationship can affect application of the discovery rule, it remains the case that "a person owed a fiduciary duty has some responsibility to ascertain when an injury occurs." *Computer Assocs.*, 918 S.W.2d at 456. "[W]hen the fact of misconduct becomes apparent it

14

can no longer be ignored, regardless of the nature of the relationship." *S.V.*, 933 S.W.2d at 8.

Under these facts, the fiduciary duties owed to Kenneth by his brothers do not compel application of the discovery rule to save Kenneth's otherwise time-barred claims. In addition to his beneficiary status, Kenneth was also a trustee with his own obligation to monitor the Trust's finances, and it is clear he was aware of facts that obligated him to make further inquiry, which would have revealed the Memorandum of Lease.

Moreover, we would have to ignore the true nature of the relationships here to conclude that Kenneth was somehow lulled into inaction by virtue of his status as a trust beneficiary. Again, his relationship with his family can only be described as extremely litigious and hostile. Such hostility alone does not absolve any party of his fiduciary duties, but the question here is not merely whether Kenneth was owed fiduciary duties. The question is whether he was "unable to inquire into the fiduciary's actions or unaware of the need to do so." *Id.* On that score, there is no indication in this record that Kenneth slept on his rights because he justifiably trusted his co-trustee brothers to fairly represent his interests. He knew the Ranch was being leased, and he knew or should have known that lease payments were absent or inadequate. He openly distrusted his brothers and had every reason to make further inquiry. He did not, and the mere fact that his brothers, as fiduciaries, should have better informed him of the lease terms does not absolve him of the obligation to exercise reasonable diligence by inquiring further. Had he done so, the lease terms were by no means

15

inherently undiscoverable. They were recorded in the Memorandum of Lease seven years before Kenneth sued.[2]

For these reasons, the district court properly granted summary judgment against Kenneth on the statute of limitations. The court of appeals erred by reversing this part of the judgment.

**B.**

We turn now to whether Kenneth and Chelsea can properly bring the claims they have asserted. The lower courts concluded they could not. The parties describe this question as one of "standing." As we explained in *Pike v. Texas EMC Management, LLC*, "standing" has historically not always been used in its "proper, jurisdictional sense." 610 S.W.3d 763, 774 (Tex. 2020). To have standing in the "proper, jurisdictional sense," a plaintiff must allege, among other things, a concrete, particularized injury in fact. *Heckman v. Williamson County*, 369 S.W.3d 137, 154 (Tex. 2012).

Rather than arguing over whether Chelsea and Kenneth have satisfied their burden to allege a concrete, particularized injury, the parties have focused exclusively on whether Chelsea and Kenneth fall within the class of persons statutorily authorized to bring the causes of

---

[2] In *Ditta v. Conte*, this Court held that "a trustee removal action, regardless of the underlying grounds on which it is brought, is not subject to a limitations analysis," and, therefore, "[n]o statute of limitations period applies in a trustee-removal suit." 298 S.W.3d 187, 192 (Tex. 2009). In the district court, Kenneth's counsel appeared to concede the opposite, stating that if the limitations ruling is upheld on appeal, that ruling would apply to the removal action, because "the basis that we would have urged for removal" was factually the same as other claims. Kenneth makes no argument in this Court that limitations does not apply to his trustee removal claim, and we consider any such argument waived.

16

action they have asserted. We will confine our inquiry to the statutory-interpretation question framed by the parties. Resolving that question may overlap with, but does not necessarily implicate, questions of standing bearing on subject-matter jurisdiction. *Pike*, 610 S.W.3d at 775.[3]

## 1.

The district court ruled that Chelsea was not authorized by statute to bring any of her claims, regardless of their merits. The court of appeals agreed that Chelsea's claims were properly dismissed on this basis. 2020 WL 1060576, at *4. We disagree.

Chelsea asserted claims for a trust accounting, for removal of her three uncles as trustees, and for breach of fiduciary duty against her uncles. By statute, district courts have "original and exclusive jurisdiction over all proceedings by or against a trustee and all proceedings concerning trusts," subject to exceptions not relevant here. TEX. PROP. CODE § 115.001(a). This jurisdiction extends to claims seeking to "determine the powers, responsibilities, duties, and liability of a trustee." *Id*. § 115.001(a)(4). The parties do not dispute that Chelsea's claims fit this description. "Any interested person" may bring such a claim. *Id*. § 115.011(a). The parties dispute whether Chelsea is

---

[3] For instance, the statutory inquiry into whether an unnamed beneficiary is an "interested person" may resemble in some respects the jurisdictional inquiry into whether the unnamed beneficiary has alleged a concrete injury, and in that context it may be addressed in a jurisdictional plea. The two are nevertheless distinct inquiries, and our analysis is confined to the statutory question as framed by the parties.

an "interested person" and thereby authorized by statute to bring her claims.

The Property Code provides detailed definitions of many of the relevant terms, and these definitions control our inquiry. An "interested person" includes a "beneficiary" as well as any other "person who is affected by the administration of the trust." *Id.* § 111.004(7). A "beneficiary" is "a person for whose benefit property is held in trust, regardless of the nature of the interest." *Id.* § 111.004(2). An "interest" includes "any interest, whether legal or equitable or both, present or future, vested or contingent, defeasible or indefeasible." *Id.* § 111.004(6). The Code further instructs that "[w]hether a person, excluding a trustee or named beneficiary, is an interested person may vary from time to time and must be determined according to the particular purposes of and matter involved in any proceeding." *Id.* § 111.004(7).

With these statutory instructions in mind, we turn first to the Trust Agreement to determine whether Chelsea possesses the requisite status entitling her to bring her claims. She is plainly a beneficiary under Section 1.1, which states:

> 1.1 <u>Beneficiaries</u>. We hereby establish one trust (which shall be known as the "BERRY DYNASTY TRUST") for the benefit of our children, DENNIS W. BERRY, KENNETH L. BERRY, MARVIN G. BERRY, and ALLEN L. BERRY, and their issue. Such children and issue are sometimes referred to hereinafter as "demand beneficiaries."

As Kenneth's daughter, Chelsea is a beneficiary of the Trust. In general, this status alone authorizes her to "bring an action under Section

18

115.001." TEX. PROP. CODE § 115.011(a). Chelsea is not a "named beneficiary," however. Only the four brothers are named. Because she is not named, Chelsea may or may not be authorized to bring a claim under section 115.011. Whether she can do so "must be determined according to the particular purposes of and matter involved in [the] proceeding." *Id*. § 111.004(7).

Given Chelsea's interest in the Trust as described in the Trust Agreement, we cannot conclude that she is not "interested" in the matters her claims raise. The Partnership, which Chelsea alleges was owed the payments, is 98% owned by the Trust. Chelsea's claims are, at bottom, that her uncles have robbed the Trust to enrich themselves. She alleges they did so either by underpaying rents owed to the Partnership, paying no rent at all, or misdirecting rental payments to other family businesses for their own profit. She seeks not only to remedy past financial injury to the Trust but for an accounting to establish the extent of the injury and removal of her uncles as trustees, which she believes will protect the Trust in the future. After examining the Trust Agreement, we conclude Chelsea has two interests in the Trust that are sufficient to make her an "interested person" for purposes of this litigation.

First, Chelsea has a present financial interest in the Trust that could be affected by the suit and the relief it seeks. Section 1.3 of the Trust Agreement states that any demand beneficiary is entitled to make withdrawals from the Trust for her proportionate share of any contribution to the Trust. Under Section 5.27, contributions to the Trust may be made by any donor at any time. Under Section 1.3, the

19

withdrawal right is subject to certain limitations as to amount, timing, and the desires of the contributor. Nevertheless, if rental payments had been made to the Partnership instead of being misdirected to other entities or not paid at all, and if FB Ranch had distributed those rental payments to the Trust, as would have been entirely appropriate, Chelsea would have had a right to a share of that contribution to the Trust. Although this "interest" is dependent on decisions others would make regarding contributions to the Trust and disbursements from it, we cannot say that a demand beneficiary like Chelsea is not "interested" in the cash flow to the Trust.

Second, Chelsea also has a contingent interest in distributions under Section 1.2 of the Trust Agreement. Section 1.2 provides that the trustees may make equal distributions to the four sons as deemed "reasonably necessary for the health, maintenance, education, and support of such [son]." It also provides that if during the term of the Trust any son dies, "then the trustee shall distribute to such deceased [son's] descendants such amount that would have been distributed to such deceased [son]." Chelsea therefore has a right to distributions under the Trust Agreement, contingent only on her outliving her father. The term of the Trust continues throughout her life, because under Section 6.1 the Trust is irrevocable, and under Section 2.1, the Trust does not terminate until 21 years after the death of all descendants of Marvin and Laura living at the time of the Trust's creation. Chelsea was living when the Trust was created. Although her distribution right is contingent on her father's death, its contingent status alone cannot render it an insufficient "interest," as section 111.004(6) defines the

term. Under the statute, an "interest" exists whether the interest is "present or future, vested or contingent, defeasible or indefeasible." TEX. PROP. CODE § 111.004(6). Chelsea's claims allege financial impropriety significantly reducing the funds flowing to the Trust, and the contingent nature of her interest in distributions after her father's death does not, on its own, make her insufficiently "interested" in such claims. Holding to the contrary would essentially undo the statute's express grant of rights to parties with "contingent" interests. *Id.*

In reaching the contrary conclusion, the court of appeals relied on *Davis v. First National Bank of Waco*, which holds: "An expectant heir has no present interest or right in property that he may subsequently inherit and consequently he cannot maintain a suit for the enforcement or adjudication of a right in the property." 161 S.W.2d 467, 472 (Tex. 1942). *Davis*, however, did not involve trusts, and did not involve the statutes at issue here, which control our inquiry. In addition, *Davis* addressed the ability of expectant heirs to litigate over their parents' property rights while their parents remained alive. In contrast to a merely expectant heir, Chelsea is a beneficiary with present rights granted to her by the Trust Agreement. And, applying the statutory definitions as we must, we cannot conclude that contingent beneficiaries are insufficiently interested merely because their "interest" is "contingent." TEX. PROP. CODE § 111.004(6). We see no reason to doubt the vitality of the rule *Davis* states, but it has no application in this case.

As an unnamed trust beneficiary with an interest in the "particular purposes of and matters involved in" this proceeding, Chelsea falls within the class of persons authorized by statute to

21

maintain her claims. The dismissal of her claims by the courts below was therefore improper.[4]

**2.**

Kenneth, in his capacity as trustee, brought several claims against the non-trustee defendants by which he seeks to vindicate the rights of the Trust. Kenneth also asserted similar claims, in a derivative capacity, on behalf of the Partnership. The court of appeals agreed with the district court that all these claims could not proceed. 2020 WL 1060576, at *5–6. Kenneth argues in this Court that he had the legal authority to bring these claims, either as a trustee or derivatively on behalf of the Partnership. We disagree and affirm the court of appeals' decision on this issue.

Kenneth first contends that, as a trustee, he can bring claims on behalf of the Trust against third parties. Kenneth is correct that a "trustee" is generally an "interested person" who may "bring an action under Section 115.001." TEX. PROP. CODE §§ 111.004(7), 115.011(a). But the claims at issue seek to vindicate the rights of the Trust, and the Trust has four co-trustees, three of whom oppose Kenneth's desire to assert the Trust's rights as he has. The question, then, is how to determine who may bring claims on behalf of a trust when co-trustees disagree. The Legislature has provided an unsurprising default rule:

---

[4] We address only whether the Property Code authorizes Chelsea to bring her claims, not whether those claims may succeed or fail for any other reason. When the district court ruled on the family's statute-of-limitations motion, it had already dismissed Chelsea's claims, so it did not assess whether Chelsea's claims, like Kenneth's, are time-barred. Neither party asks us to address the limitations question as to Chelsea, and that question remains open on remand.

"Cotrustees may act by majority decision." *Id.* § 113.085(a); *see also* RESTATEMENT (THIRD) OF TRUSTS § 39 (AM. L. INST. 2003) ("[I]f there are three or more trustees their powers may be exercised by a majority.").

The Trust Agreement could have altered this rule, but it does not. Instead, Section 5.2 of the Trust Agreement states that the Code shall apply "as fully as though its provisions were written into this instrument." The result is that the trustees "act by majority decision." TEX. PROP. CODE § 113.085(a). Naturally, the other trustee brothers do not want the claims asserted by Kenneth on behalf of the Trust to proceed. In fact, the Consent Agreement they signed after the lawsuit was filed released any such claims and stated that the other trustees believe it is not in the best interests of the Trust for such claims to proceed. Faced with what amounts to a 3-1 vote of the trustees against him, Kenneth has no unilateral power to act for the Trust in court against the wishes of a majority of the trustees.

Kenneth argues that trustees in his situation must have some recourse when, as alleged here, the other trustees have conspired with the non-trustee defendants to injure the Trust. But Kenneth does have recourse. He can seek removal of the other trustees, *see id.* § 113.082, as he did in this suit. The defendants do not contest his authority to seek such relief. Further, the defendants do not dispute that Kenneth was permitted as a beneficiary to sue his brothers for breach of fiduciary duty. They oppose that claim on limitations grounds, not on the theory that Kenneth lacks the authority to bring it.

All that remains is Kenneth's argument that he could, in a derivative capacity, sue on behalf of the Partnership. He observes that

23

a limited partner may be authorized to bring a derivative suit on behalf of a limited partnership for breaches of duty by the general partner. *See* TEX. BUS. ORGS. CODE § 153.401 *et seq.* He claims that FB Ranch, the general partner, breached certain duties and that the other non-trustee defendants aided and abetted FB Ranch's breaches.

These claims fail because Kenneth himself is not a limited partner in the Partnership. The Trust is the limited partner, so it is the Trust—not Kenneth—that might be able to sue derivatively on behalf of the Partnership. Kenneth is merely one of four co-trustees of the Trust. As we have already established, he cannot speak unilaterally for the Trust in court. Because he does not speak for the Trust, he cannot unilaterally assert rights that belong to the Trust, including its potential right as a limited partner to bring derivative actions. The district court correctly dismissed Kenneth's claims against the non-trustee defendants brought on behalf of either the Trust or the Partnership.

## C.

Kenneth complains of discovery rulings by the district court. We need not address the details of these complaints, however, because all Kenneth's claims fail as a matter of law for the reasons explained above. Kenneth does not argue that different discovery rulings would have saved his claims from either the limitations bar or from his inability as a lone co-trustee to act on behalf of the Trust. As a result, he cannot show that the district court's discovery errors, if any, "probably caused the rendition of an improper judgment" or "probably prevented [him]

24

from properly presenting the case to the appellate courts." TEX. R. APP. P. 61.1.[5]

### D.

Finally, Kenneth complains of the district court's award of attorney's fees. The district court conducted a two-day trial on fees. It awarded offsetting $85,000 amounts to both Kenneth and the defendants. Kenneth submitted evidence that he incurred fees substantially in excess of the fees awarded. But he lost the case on summary judgment, so he can hardly complain that the district court did not award him more fees.

When it comes to attorney's fees, "the degree of success obtained" should be "the most critical factor in determining reasonableness of a fee award." *Farmers Grp., Inc. v. Geter*, 620 S.W.3d 702, 713 (Tex. 2021). Kenneth obtained little success, if any, so he cannot demonstrate the fee award was unreasonable. If anything, the district court acted generously toward Kenneth, the losing party, by conforming the fee award to the "general rule in our legal system . . . that each party must pay its own attorney's fees and expenses." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 550 (2010).

---

[5] To the extent Chelsea, on remand, believes that she needs additional discovery, she is free to pursue it, although we express no opinion as to whether such discovery would be warranted in the current posture of the case.

## III.

The district court properly disposed of all of Kenneth's claims. Chelsea's claims, however, should have been allowed to proceed. The judgment of the court of appeals is affirmed in part and reversed in part, and the case is remanded to the district court for further proceedings.

James D. Blacklock
Justice

**OPINION DELIVERED:** May 13, 2022